OCTOBER AND NOVEMBER TERM, 1884, NO. 95. OCTOBER 30, 1884.

## Appeal of Rev. Nevin Woodside *et al.*

1. The First Reformed Presbyterian congregation of Pittsburgh, at a meeting held for that purpose, elected W as their pastor, which election was certified to the Pittsburgh Presbytery, and by it accepted and forwarded to the Northern Presbytery, of which W was a member. W regularly accepted the call, and was dismissed from the Northern to the Pittsburgh Presbytery as being in good and regular standing. W then gave up his church in Brooklyn, removed to Pittsburgh, and com-

menced preaching in said church, but was never regularly installed. By the rules of the church the pastor-elect has not the right of a pastor until installed by the Presbytery. The usual bond of the trustees was given him, promising to pay him $1,600 a year. Afterwards, resolutions were passed by the elders and trustees forbidding W to preach in the church, and he was enjoined by the Pittsburgh Presbytery from preaching therein, which action was sustained by the Northern Presbytery and by the General Synod. W continued to preach in, and retain possession of, the church.

*Held,* that W's attempt to disregard the action of the Presbytery was in violation of the duly constituted authority of the church, and there was no error in decreeing a perpetual injunction to restrain him from preaching in the church building or officiating as pastor.

Before MERCUR, C. J.; GORDON, PAXSON, TRUNKEY, STERRETT, GREEN, and CLARK, JJ.

Appeal of Rev. Nevin Woodside *et al.* from the decree of Common Pleas, No. 1, of *Allegheny County,* making perpetual an injunction restraining defendants from preventing Samuel W. Douglas, or any other person whom the Pittsburgh Presbytery may appoint, from preaching in, and occupying the pulpit of, the First Reformed Presbyterian Congregation of Pittsburgh; restraining Rev. Nevin Woodside from preaching in said church building or officiating as pastor, and restraining defendants from interfering with and preventing plaintiffs from lawful occupation, enjoyment, and possession of said church property, &c.

Bill in equity by the First Reformed Presbyterian Congregation of Pittsburgh *et al.* against Rev. Nevin Woodside *et al.*

A preliminary injunction was granted on January 3, 1881. An answer was afterwards filed, and C. Hasbrouck was appointed examiner and master.

October 11, 1883, the master filed his report, finding, *inter alia,* the following facts:

The members of this church or congregation were incorporated in 1839, by the name of the "Trustees of the First Reformed Presbyterian Congregation of Pittsburgh." The charter provided, among other things, for the election of trustees annually, by "all persons who shall be regularly enrolled worshipers in said congregation," &c. In 1843 an amendment was made to the charter, whereby the election of trustees was restricted to "all male persons who shall be regularly enrolled worshipers in said congregation," &c.

The congregation owns certain real estate, on which is the church building, &c., on Oak alley, in the city of Pittsburgh—the title to which is held by the trustees.

[Appeal of Rev. Nevin Woodside *et al.*]

This congregation is a constituent part of the Reformed Presbyterian church in North America, being governed by the general synod, and by the Pittsburgh Presbytery of that church, and by its own session. The general synod is the chief and sole legislative authority and supreme judicatory of the Reformed Presbyterian church in North America, having appellate jurisdiction in all cases, and original jurisdiction where it seems fit to exercise it, over the congregations, officers, and members of that church.

The Pittsburgh Presbytery has jurisdiction and control over the congregations and members within its bounds ; the right to appoint ministers to preach in vacant pulpits ; to accept or reject a minister elected by a congregation; and if it accepts him, to install him as pastor of such congregation. By the rules of church government in the Reformed Presbyterian church, a pastor elect who has accepted the call has not the right or power of a pastor over the congregation until he is regularly installed by the Presbytery. The preaching to the congregation by the pastor-elect before installation, as usually occurs, is only by permission of the Presbytery ; and the Presbytery to which the congregation belongs may appoint any other minister to preach to that congregation, until a pastor is installed. Nevertheless, it is customary, when no objection is made, as a matter of courtesy, to accord to such pastor-elect all the right of a pastor installed, and in such case he performs the duties of a pastor, by the presumed consent of Presbytery and all others concerned.

The session of a church or congregation is composed of the elders, with the pastor as moderator, or presiding officer. It has the spiritual government over the congregation, under and subject to the Presbytery. In the absence of an installed pastor, the elders may call upon the Presbytery to send them a minister of the same Presbytery to act as moderator ; or, if requested by the elders, the pastor-elect may preside over them on a particular occasion, presumably with the consent of the Presbytery.

The former pastor of this congregation, Rev. Wm. Young, having died in 1878, the pulpit became vacant, and after being supplied for a time in the usual way by the authority of the Presbytery, the elders and members took action towards procuring a settled pastor. And on the 8th of September, 1879, an election was held by the congregation in the church building, for selecting a pastor. That election, or congregational meeting, was presided over by the Rev. Samuel Young, then the moderator of the Pitts-

burgh Presbytery. Some time prior to this meeting the session or elders had drawn up a certain form of procedure, or regulation for conducting the election, to be submitted to the meeting, and among them was a provision authorizing absent members to vote by proxy. They also had prepared printed blank forms of proxy to be used. These forms of procedure and forms of proxy were presented to the meeting, and adopted by it, before the election began. These proxy votes, 83 in number, were cast by both parties, and no objection was made at that election to voting by proxy, nor does it appear that more proxy votes were cast for one candidate than for another. It does not appear for whom they were cast. Objections were made to certain persons voting, but not the manner of voting by proxies; and all questions arising upon the objections were decided by the moderator. At that election, 283 votes were cast, of which 167 were for Rev. Nevin Woodside, and 116 for the other three candidates combined; making a majority over all others of 51 votes for Rev. Nevin Woodside; and he was declared by the moderator elected. An appeal was taken from the decision of the moderator, in deciding that Rev. Nevin Woodside was elected, to the Pittsburgh Presbytery; which, at a special session held September 24, 1879, sustained the decision of the moderator—thus sustaining his election.

From that decision of the Presbytery, an appeal was taken to the general synod; but this last appeal was never carried up to the synod; it was abandoned.

That election was certified to the Pittsburgh Presbytery as a call; was accepted by the Presbytery at its said special session of September 24, 1879, and according to the laws and discipline of the church, forwarded to the Northern Presbytery of the Reformed Presbyterian church, of which Rev. Nevin Woodside was then a member, and under its care; and by the Northern Presbytery, accepted and presented to Rev. Nevin Woodside, who accepted the call; and thereupon, according to the laws of the church, the Northern Presbytery, on October 13, 1879, granted him the usual certificate in such cases, dismissing him from the Northern Presbytery to the Pittsburgh Presbytery as a pastor in good and regular standing.

That certificate was placed in the hands of the moderator of the Pittsburgh Presbytery, and immediately thereafter Rev. Nevin Woodside removed from Brooklyn, N. Y., where he had been pastor of the First Reformed Presbyterian church of that city, and came to the city of Pitts-

[Appeal of Rev. Nevin Woodside *et al.*]

burgh, and on the 19th day of October, 1879, commenced preaching in this church. The usual obligation (called a bond) of the trustees was given to him, promising to pay him $1,600 a year, while he should remain pastor of the congregation; this was dated September 24, 1879.

On November 7, 1879, another special meeting of the Pittsburgh Presbytery was held for the purpose of receiving the credentials of Rev. Nevin Woodside, and, as is usual with that body, the first question put was: 'Shall the call for this meeting be sustained?'

On being put to vote, it was not sustained, for what reason does not appear.

On November 27, 1879, another special meeting of the Pittsburgh Presbytery was held for the same purpose as the last, when, after sustaining its own call, instead of passing upon the question of receiving the credentials of Rev. Nevin Woodside, some other resolution was offered as a substitute for it.

The moderator, Rev. Samuel Young, thereupon ruled this substitute as out of order, as not being within the terms of the call, and that a special meeting such as this could not act upon anything not specified in the call for the meeting. An appeal was thereupon taken to the house for this ruling of the moderator, and the moderator was overruled.

Rev. Samuel Young, the moderator of the Pittsburgh Presbytery for the then current year, presiding at that special meeting, being unwilling to take a part in what he believed to be a violation of rule 31, left the chair, and refused to act further as moderator at that meeting; thereupon, Rev. John Alford was elected moderator by that special meeting in place of Rev. Samuel Young. Some other proceedings were then had, but no further action was taken at that meeting relating to the First Reformed Presbyterian church.

On October 21, 1879, at a meeting of the elders of this congregation, a resolution was passed by a majority of them declining to have Rev. Nevin Woodside preach in this church.

On October 24, 1879, at a special meeting of the board of trustees of this church, all being present, nine in number, a resolution was offered forbidding Rev. Nevin Woodside to preach in this church, and that steps be taken to prevent his installation, as being in accordance with the will of the elders. At this time the board of trustees consisted of Samuel Barckley, president; Henry J. McCracken, Josiah Stevenson, Hugh Young, (four of

the defendants,) Alexander Black, Thomas Biggerstaff, James W. Houston, James W. Logan, and A. K. Whiteside, secretary, (five of the plaintiffs.)

The meeting was called to order by President Barckley, and, thereupon, Barckley, McCracken, Stevenson, and Young protested against this meeting being held on the ground that no notice of this meeting had been read from the pulpit, and that it had not been called by the president of the board. It had, in fact, been called by the secretary, Mr. Whiteside, sending notices to all the members. The question whether it was a 'legal' meeting was put to vote, and decided in the affirmative by five to four.

The resolution forbidding Rev. Nevin Woodside to preach in the church was voted upon by all, and carried by the same vote, five to four. Then the resolution to take steps to prevent his installation was offered, which was objected to, and a motion to adjourn was made, and put, and voted down, four to five, by the chairman, Samuel Barckley, hearing only four yeas and two nays, decided the meeting adjourned, and Mr. Barckley, Mr. McCracken, Mr. Stevenson, and Mr. Young rose to leave the meeting. Then a motion was made to declare the chairmanship vacant, and to elect Alexander Black president of the board, which was voted by the five, and the other four left the room.

The charter of this church provides (Article 8) that the trustees, or a majority of them, may meet as often as they deem proper, on their own adjournment, and upon such notice and in such manner as shall be regulated by the laws ; and the said trustees, or a majority of them, so met, are empowered to elect from among themselves a president, and from themselves, or other members of the congregation, a treasurer and secretary, and to remove, change, or continue all, or either of them, at their pleasure, &c.

The charter also provided (Article 11) that vacancies in the board of trustees occurring between the annual elections, by death, resignation, or otherwise, shall be filled by the remaining members, &c. And by Article 3 : The trustees have the power to make by-laws, &c.

There is no by-law authorizing the secretary, or any other person, to call a special meeting of the board of trustees, nor any providing how notice shall be given for a special meeting.

At the time of the above meeting of trustees, on Friday, October 24, 1879, the church building was locked up, and

the key was in the hands of Mr. Biggerstaff, one of the trustees, acting with the majority. They intended to keep Rev. Nevin Woodside locked out, and to have Rev. Mr. Mackey preach in the church on the following Sabbath, the 26th. On the next day, Saturday, the 25th, some of the adherents of Rev. Nevin Woodside got into the church, and took possession of it, and put a new lock on the door, and kept possession, and on Sabbath, the 26th, Rev. Nevin Woodside occupied the pulpit, and continued to preach in the church until after this bill was filed, and until the preliminary injunction was granted in this case.

On the 8th of December, 1879, was the next regular stated meeting of the board of trustees, when all of them, nine in number, were present, and the meeting was called to order by Samuel Barckley, when the question was at once raised whether he or Mr. Black was the president. Both claimed it. The question was put to vote, and decided (5 to 4) that Mr. Black was president of the board. A motion was then made to approve the minutes of the last previous meeting of October 24th, which passed by the same vote, five to four.

On December 16, 1879, the elders were authorized by Presbytery to engage a minister to supply the pulpit, and they engaged Rev. Mr. Clyde to preach in the morning of the following Sabbath, the 21st, but, to avoid a conflict, he was advised by his friends not to go to the church.

On December 21, 1879, Rev. Nevin Woodside preached in the church in the morning, and Sabbath-school was held at 2 o'clock in the afternoon.

The other party (opposed to Rev. Woodside) had appointed that afternoon at half-past three for preaching by the Rev. Mr. Clyde, and met at that hour, when the Sabbath-school was about closing. Both parties then met in the church, when a strife arose between them; the police were called in to quell it, and the Rev. Mr. Clyde did not preach in consequence of the trouble.

And from this time forth the trustees were divided into two parties, (five to four,) each party claiming to be the regular board.

At this meeting of the five trustees, (March 9, 1880,) they, constituting a quorum, organized with Mr. Black as president, and, among other things, passed unanimously a by-law providing: 'Whenever the church building is destroyed by fire, or by other causes, or possession of the same is inaccessible to any of the trustees, or, in the opinion of the president of the board of trustees, it will not be

expedient or advisable to hold the meeting for the election of trustees on the last Monday of March, at the church building, as provided in Article 9 of the charter and its amendment, that the said meeting on the last Monday of March, for the election of trustees, shall be held at the house occupied by the janitor, on the church premises, or at any other place the president may suggest,' &c., and provides for notice thereof by publication, &c.

The elders of the congregation, six in number, were likewise divided into two parties, each party claiming to be the true session of the church. They stood four against the Rev. Nevin Woodside, and two for him, at first; but, soon after, five to one.

On the 26th of January, 1880, those of the congregation supporting Rev. Nevin Woodside elected five additional elders, thus bringing their number up to six.

On January 28, 1880, the Pittsburgh Presbytery held another special session at Beulah to 'investigate existing difficulties in the First Reformed Presbyterian church, Pittsburgh, Pa., and take such action as may be deemed necessary to adjust them.' This call was unanimously sustained by that Presbytery.

At that session of Presbytery, J. W. Houston and Alexander Black, two commissioners from this church, appeared and presented a complaint against Mr. Woodside, and petitioned the Presbytery to enjoin him from preaching in their pulpit until he had been regularly installed, and to take control of their pulpit, etc., and to take immediate steps to bring charges against him before the Northern Presbytery for his conduct since he came within the bounds of this Presbytery.

That complaint was received, and, thereupon, that Presbytery resolved :

"That Presbytery enjoin Rev. Nevin Woodside from preaching in the First Reformed Presbyterian Church of Pittsburgh, &c."

An adjourned meeting of this Presbytery was held at Deer Creek, February 18, 1880, at which Rev. Samuel Young presented and read an appeal.

It was resolved that the appeal be not received.

Rev. Nevin Woodside desired to read a declaration, which was ruled out of order.

It was then

"*Resolved*, That the injunction restraining the Rev. Nevin Woodside from preaching in the pulpit of the First Reformed Presbyterian church of Pittsburgh, or in any way interfering with, or controlling, be indefinitely

continued, and that the charges against Rev. Nevin Woodside be accepted and forwarded to the Northern Presbytery.'

On March 16, 1880, the Northern Presbytery met in New York in special session, on call of the moderator, 'to consider complaint made by the Pittsburgh Presbytery against Rev. Nevin Woodside for disorderly conduct, &c.'

Whereupon, it was

"*Resolved*, That the Rev. Nevin Woodside is hereby directed to cease preaching in the First church, Pittsburgh, and to retire from the occupancy of that pulpit until after the meeting of General Synod, to which court this Presbytery refers the whole matter."

Mr. Woodside attended at this meeting of the Northern Presbytery, his name being on the roll of members.

From November 29, 1880, on, there have been two boards of trustees, each claiming to be the true one under the charter of this church, and entitled to the possession of the property.

On May 4, 1880, the Northern Presbytery met in New York, and the trial of Mr. Woodside was taken up.

Mr. Woodside read a list of persons, (from fifty to seventy in number,) he wished to be cited, or requested to appear as witnesses. His request was referred to a committee, who reported that 'Mr. Woodside should have made his request at the proper time. The committee consider the request as vexatious, and tending to retard business,' which report was adopted.

At this stage of the proceeding, Mr. Woodside arose and declined the authority of the court, stating that he would appeal to the General Synod, and left the house, declaring that 'now and forever he retired from the jurisdiction of this court.'

At an adjourned meeting the committee reported that 'Rev. Nevin Woodside had been convicted upon evidence of the charges preferred against him by the Pittsburgh Presbytery, and by the session of the First church, Pittsburgh,' and expressed the 'judgment of this court to be that Rev. Nevin Woodside be suspended from the exercise of his office until evidence of his reformation be exhibited.'

The report was adopted and sentence pronounced.

The General Synod of the Reformed Presbyterian church in North America met in Pittsburgh, Pa., May 19, 1880, at which the following was adopted:

"WHEREAS, Rev. Nevin Woodside was suspended

from the office of the ministry by the Northern Presbytery, after due trial;

"*And whereas*, Synod has refused to sustain his declination and appeal to Synod;

"*And whereas*, He has declined the authority of the Synod, appealed to the great head of the church, and withdrawn from our jurisdiction; therefore,

"*Resolved*, That his name be, and hereby is, stricken from the roll of General Synod."

The master reported, *inter alia*, as follows:

"I am of opinion that those seven named in the plaintiff's bill, to wit: Alexander Black, Thomas Biggerstaff, James Logan, James W. Houston, A. K. Whiteside, James N. McMillan, and A. D. Munn, together with Samuel Barckley and H. J. McCracken, two of the defendants, making nine in all, were the trustees of this church at the filing of this bill, for the following reasons: Prior, and up to the election of trustees, March 29, 1880, the board consisted of Samuel Barckley, H. J. McCracken, Alexander Black, Thomas Biggerstaff, James Logan, and James W. Houston, (six elected in 1878 and 1879,) and A. K. Whiteside, Josiah Stevenson, and Hugh Young, (three elected in 1877,) whose terms would expire March 29, 1880.

"The last time they all (9) met and acted together was December 8, 1879, after which they divided into two parties—five of them, Black, Biggerstaff, Houston, Logan, and Whiteside, composing a majority, and, therefore, a quorum, continued to meet as a board from time to time, up to the election of trustees, March 29, 1880, when, at the election held at Col. Stone's office, and presided over by Alexander Black, president of the board, A. K. Whiteside was reëlected, and John McMillan and A. D. Munn were elected for three years, in place of Josiah Stevenson and Hugh Young, whose terms then expired.

"This election was presided over by Alexander Black, president of the board, as required by the charter.

"The other election was presided over by Samuel Barckley, who had been superseded in his office of president by Alexander Black on October 24, 1879. The change of President from Barckley to Black, made October 24, 1879, was within the express power of the board, as we have seen, (charter, Art. 8,) and this change was again confirmed at a full meeting of the board, December 8, 1879.

"Alexander Black was, therefore, the president of the

board of trustees, and who alone could preside at an election of trustees.

"Now, the trustees hold the church property to be used for religious purposes as the ecclesiastical authorities, the session, and Presbytery shall direct.

"The power to regulate the public worship in the church belongs wholly to the church judicatories, and is a matter with which the courts will not interfere further than is necessary to protect individuals, as citizens, in their rights to property, or emoluments connected therewith.

"Having thus ascertained who were the trustees, and finding that seven of the nine, composing a majority and quorum, capable of acting as a board, are among the plaintiffs in this suit; and finding also that the board of trustees had previously, at a meeting held October 24, 1879, passed a resolution forbidding Rev. Nevin Woodside to preach in this church, and that the church building was in the possession of the defendants at the time of bringing this suit, and held by them against the will of the majority of the lawful trustees, it follows that the said trustees, plaintiffs, or their successors in office, must be restored the possession of the church property. And this without regard as to who were the elders or session of the congregation at the time, a question made by the eighth section of the bill and answer; for the lawful board of trustees must be put in possession before they can respond to the session or Presbytery as to the use of the property.

"And this court cannot anticipate that the lawful board of trustees, when put in possession of the church property, will not manage it according to the direction of the true session and Presbytery, nor until the trustees shall err in their duty in the premises can this court be called upon to decide which of these two parties compose the true congregation.

"And, notwithstanding Rev. Nevin Woodside has been suspended by the Northern Presbytery and by the General Synod for disobeying the injunctions issued at one of those meetings of Presbytery, forbidding him to preach in this church—which injunction was issued without a hearing, and was accompanied by an order striking down the election by this congregation, as well as the acts of a former session of Presbytery—it would seem that he has been the victim rather than the cause of the unhappy division of this congregation, and that he has been supported by the majority of the congregation in a struggle

which he and they believed, at least, to be in the support and maintenance of the rules and discipline of the Reformed Presbyterian church.

"And whether they have erred therein or not, it is not now the duty of this court to decide. It is sufficient that the lawful trustees be put in possession of the church property.

"For these reasons I am of opinion that the injunction heretofore granted should be made perpetual, and that the defendants be decreed to pay the costs of this proceeding, including the master's fee."

Both parties filed exceptions to the master's report, which were dismissed, and on April 17, 1884, it was ordered, adjudged, and decreed that the injunction theretofore granted be made perpetual, and that the defendants pay the costs, etc.

The Court STOWE, P. J., filed the following opinion:

"We are not called upon, as this case comes before us, to consider any of the principles of law specially relating to rights of churches and congregations, where secession or excision, conformity or non-conformity to the tenets of a religious society are involved. The rights of all parties here must be controlled by the rules of government and discipline peculiar to the Reformed Presbyterian church, and the only question for the court now to determine is, under the evidence before us, which party is entitled to the possession of the pulpit and the consequent occupancy of the First Reformed Presbyterian church, under the established system of government recognized by that body.

"The substantial facts, so far as they are important to this view of the question, are as follows:

"There being a vacancy in the pastorate of this church, an election was held by the congregation on the 8th September, 1879, for the purpose of selecting a pastor at a meeting, presided over by the Rev. Samuel Young, then moderator of the Pittsburgh Presbytery, to which this congregation belonged. At that election the Rev. Nevin Woodside was declared to be elected, but a large number of persons, including some, if not all, of plaintiffs, protested against the election as illegal, and appealed to Presbytery for a determination of the controversy.

"On the 24th September, a body claiming to be the Presbytery met, and, after a consideration of the question, sustained the election, and recognized the call of Rev. Woodside as valid and legal, thus overruling the appeal; and the call was thereupon duly certified to the North-

ern Presbytery, of which he was a member. The North-
ern Presbytery also recognized the call, and submitted it
to Mr. Woodside in the ordinary manner. He accepted
it as a regular call, under the laws of the church, and the
Northern Presbytery then gave him the usual certificate
of dismission, (so called,) and character required in such
cases. The bond required under such circumstances was
also executed and delivered to Mr. Woodside, securing
him a salary of $1,600 per annum while he remained pas-
tor of First Reformed church of Pittsburgh. He shortly
after removed here, commenced preaching in the church,
and has continued to do so, claiming the right as pastor
of this congregation till the present time, but has never
been installed.

"Here arises the first ground of contention. The de-
fendants claim that Mr. Woodside had a legal right to
occupy this pulpit from the time he accepted the call and
entered upon the duties of pastor, and that the foregoing
facts, without installation, were all that was necessary to
create the relation of pastor between him and this
congregation, and that the Presbytery had no right to in-
terfere, and prevent or refuse his installation, or other-
wise to enjoin his preaching or acting as pastor, without
legal cause alleged and shown upon a trial, with proper
notice, according to the established discipline of the
church.

"If this were so, then it would follow that the proceed-
ings of the Pittsburgh Presbytery at Beulah and Pitts-
burgh, subsequent to the meeting which ratified the call
of Mr. Woodside, would be disorderly, and go for noth-
ing in this hearing, because, whatever its form and pre-
tense, it would have been practically a trial and ouster of
a duly and legally constituted pastor, without regular
process, notice, and hearing, and therefore illegal and
void. But we think that, under the rules for the govern-
ment of this church, Mr. Woodside never was the pastor
of this church, and that his acceptance of the call and
dismissal from the Northern Presbytery, and the other
facts in evidence in regard to that matter, did not and
could not of themselves create the legal relation of pas-
tor between him and this congregation.

"The utmost that can be claimed under the evidence on
the part of the defendants is that it is customary, under
such circumstances, for the pastor-elect to occupy the
pulpit as though he were the pastor in fact until the in-
stallation, and that his claim for salary is recognized from
the time he begins to perform the duties of his office.

[Appeal of Rev. Nevin Woodside *et al.*].

This, in cases where the pastor is subsequently installed, seems only just and proper, even where there may be considerable opposition and delay, but, so far as we can see, throws no light upon the practice where there never was a subsequent installation, by reason of the interposition of the Presbytery.

"The evidence leads us, unhesitatingly, to the conclusion that, under the laws of this church, until installation, the pastoral relation is merely expectant, and that Presbytery may, for reasons satisfactory to itself, refuse to install, and direct the candidate to vacate the pulpit. If, therefore, the Pittsburgh Presbytery have, by due process, refused to install Mr. Woodside, and ordered him to desist from preaching in this church, his action in persisting to occupy the pulpit since notice of such order has been disorderly, and in violation of his duty to the powers of the church.

"This brings us to consider the action of the Presbytery at Beulah. The evidence shows that at the election of Mr. Woodside, a large number of the members of the congregation signified their dissatisfaction, and appealed to the Presbytery for redress, alleging an undue election. On the 24th of September, several persons, undoubtedly members of the Presbytery, but whose right to act as such was earnestly resisted by reason of alleged irregularity in the call under which it convened, met at Pittsburgh, overruled the appeal taken by plaintiff, ratified the election of Mr. Woodside, and declared the action of the congregation a 'Gospel call.' Afterwards another meeting, undoubtedly properly called, was held at Beulah, on the 28th January, 1880, specially called "to investigate existing difficulties in the First Reformed Presbyterian church, and take such action as may be deemed necessary to adjust them." At this meeting complaint was made, *inter alia*, that Mr. Woodside had been illegally elected, and that the appeal of complainants had been disregarded and treated with disrespect by the so-called Presbytery of September 24, and that its action in the ratification of the call was improper and unfair, and injurious to the best interests of the church. The Presbytery examined into these complaints, and took action thereon by finally ordering that Revs. John Alford, Alex. Savage, and Samuel Young be enjoined from ordaining any 'so called' new elders, and resolved that the Rev. Nevin Woodside preach no more in the First Reformed Presbyterian church without a regular appointment from the Pittsburgh Presbytery. Of these proceedings, it is apparent

that neither Mr. Woodside nor the 'new elders' received any such notice as is required by the laws of the church where individuals are charged with scandal or other personal offenses against its discipline, and therefore the respondents claim these proceedings of Presbytery were illegal and void so far, at least, as their interests are affected by them. While it is undoubtedly true that the civil courts will not ordinarily undertake to interfere with the decisions of church judicatories as to the meaning of its constitution, confession of faith, and discipline, where civil rights or property are involved they will supervise, and, when necessary, control their action so far as to inquire and adjudge whether the judicatories have properly conformed to their own laws. And it cannot be denied that in all matters directly involving the rights or standing of individuals in the church, which, under its laws, are made the subject of investigation and punishment, said persons should have due notice of the charges against them, and be allowed time and opportunity to prepare and produce their defense, and then, if they desire it, to be reasonably heard by themselves or counsel, unless it may, perhaps, be where the established laws of the church, expressly or by necessary implication, authorize *ex parte* proceedings.

"The question now recurs: Was the action of the Presbytery such as required notice to Mr. Woodside and the 'new elders' to give it legal effect, and was it, so far as it was intended to operate upon them, illegal or void? We think not. There was, in no proper sense, a trial of any of those parties. So far as was material to the investigation before Presbytery, the matters for its consideration and determination in no respect necessarily involved their personal conduct. They were solely in regard to the regularity of the elections and the proceedings of the Presbytery which ratified the call of Mr. Woodside, on the 24th September, so far as affects the case. These matters it was not only the right, but the duty, of Presbytery to inquire into, and might be done either upon complaint or upon its own volition for the good of the church. 'The Presbytery is the essential court of the church in administering its general order.' 'And it belongs to the Presbytery, by virtue of the official authority of its members, to hear and issue complaints and appeals from church sessions, and references for advice or adjudication, to install ministers of the Gospel, and to examine and approve or censure the records of church sessions, and to visit particular churches for

[Appeal of Rev. Nevin Woodside *et al.*]

the purpose of inquiry into their state, and redressing evils which may have arisen in them, and in general, to order whatever is necessary to the spiritual welfare and prosperity of the churches under its care.' *Vide* sections three and four, article two, Form of Government Presbyterian Church.

"It is true the result in such cases often may be, and in this case was, prejudicial to individuals, but it infringed upon no legal rights, and was only the exercise of a supervisory power granted by the constitution of the church. We think the action of the Pittsburgh Presbytery was legal, and for this reason alone would be compelled to hold that Mr. Woodside has now no right to occupy this pulpit as its pastor, and that he and the other defendants are disorderly in withholding it from the control of the Pittsburgh Presbytery.

"There are, however, other reasons which plaintiffs allege lead to the same conclusion. It is claimed that the General Synod of the Reformed Presbyterian church, its highest judicatory, has adjudged that Mr. Woodside is not entitled to occupy this pulpit; has sustained the action of the Northern Presbytery, as well as the action of the Pittsburgh Presbytery, which met at Beulah, throughout; and having finally decreed, upon full hearing, that Mr. Woodside's name be stricken from the roll of the synod, has thus adjudged that he has no longer any right to act as a minister in the church.

"Such, it seems to us, is the effect of the proceedings of the Synod, and by all recognized principles of law, the judgment of that tribunal must be taken by us to be conclusive, unless palpable injustice, or a trial without sufficient notice, or a reasonable hearing is shown by the evidence.

"The minutes of the proceedings before the Northern Presbytery, and the evidence sustaining the fairness of the trial, are not overborne by the proofs to the contrary. We are bound to make every fair presumption in its favor. The Presbytery had to determine the question of necessity for the witnesses Mr. Woodside demanded should be summoned, and also as to their number. The evidence fails to impress us with the fact that, under the circumstances, injustice was done by Presbytery in refusing to summon the very large number of witnesses desired by him. Nor do we think that his 'declinature' made it the duty of the Presbytery to stay further proceedings. It had the right thereafter to proceed to final judgment. The Synod, upon prolonged examination,

[Appeal of Rev. Nevin Woodside *et al.*]

have so decided, and sustained the action of the Northern Presbytery to the fullest extent.

"We cannot see that its judgment was either unconstitutional or manifestly unjust, and therefore must take it as finally determining the right to the further possession of this church against Rev. Nevin Woodside and his co-defendants under the claims set up by them.

"An injunction is now ordered to be issued, as prayed for, upon security being entered, according to law, in the sum of $3,000."

The defendants then appealed, assigning as error the decree making the injunction perpetual, and the dismissal of the exceptions to the master's report.

*John Dalzell, A. M. Brown* and *Edward S. Golden* for appellants.

The charter enacts that in all meetings of the congregation after due notice, the acts of a majority of those present shall be binding on the congregation. A large majority at the regular meeting, after due notice, favored Mr. Barckley as president. The other party withdrew, and held an irregular meeting at a private office. The regular meeting at the church was in strict accordance with the rules and notice. The election was a civil proceeding, and the church court had neither right nor power to interfere or control.

To determine the civil rights of the trustees, there is a plain and adequate remedy at law by *quo warranto:* Hewitt's Appeal, 88 Penn. St., 55 ; Koch's Appeal, 93 *Id.*, 434 ; 39 Leg. Int., 414 ; 97 Penn., 313 ; 11 W. N. C., 379 ; 32 P. F. Sm., 163 ; 92 Penna., 168 ; *Id.*, 171 ; 93 *Id.*, 50.

The acts and decrees of church judicatories are only binding upon civil courts when it is affirmatively shown that such judicatories have acted within the scope of their authority : 5 Wr., 9 ; 27 P. F. Sm., 397 ; 8 Nor., 97. The only constitutional method by which a congregation can express itself is by congregation meetings regularly called: 27 P. F. Sm., 397 ; 17 *Id.*, 138 ; 3 Nor., 286 ; 6 Wr., 503 ; 15 Wallace, 131.

Trustees have no voice or control in the spiritual government of the congregation : 3 Brewster, 287 ; 7 Phil., 310 ; 2 Barb., 397 ; High on Extraordinary Leg. Remedies, sec. 282.

Rev. Woodside was *de facto* and *de jure* pastor-elect. He was pastor without installation : Presbyterian Dig., 419 ; Young *v.* Ransom, 31 Barb., 49 ; 12 N. J., (7 Hal·

stead), 206 ; 5 Wr., 9 ; 4 Leg. Gaz., 2 ; 9 Nor., 477 ; 22 Md., 156 ; 2 Barb., 397 ; 3 Lansing, 434 ; 3 Barr, 282 ; 11 Harris, 495.

A judicial sentence without notice or hearing is contrary to natural justice, and consequently void : 4 Wh., 601 ; 3 Barr, 124 ; 7 Watts, 441. If the Presbytery declines to install, the candidate cannot, either by ecclesiastical or civil law, be tried and condemned without an opportunity to defend himself. The Presbytery refused to summon a single witness.

The defendants denied the whole equity of the bill ; therefore, the injunction should not have been granted : Butler *v.* Farr, 1 W. N. C., 11 ; *Id.*, 199 ; *Id.*, 455 ; 1 Phila., 574 ; 27 P. F. Sm., 270 ; 12 *Id.*, 17 ; 28 *Id.*, 196 ; 4 *Id.*, 183 ; 2 *Id.*, 62 ; 18 *Id.*, 370 ; 2 Jac. & Walker, 247 ; Lewin on Trusts, *498 ; 31 Barb., 49.

*Thomas M. Marshall* and *Wm. A. Stone* for appellees.

The election for trustees was held at a private office because defendants had obtained possession of the church, and created a riot when the election was attempted to be held on the church property. The charter provides that the board of trustees shall elect their own president. The legal presumption is in favor of the decision of the church courts on all matters within their discretion. The church courts are the exclusive judges of all matters of church discretion. The call must be sustained by the Presbytery having the congregation in charge.

If the Presbytery approve of the call, it will install the pastor-elect : Install—See Webster, Worcester, Barclay, Bouvier, Wharton, Abbott. A governor, president, or any other officer-elect, cannot assume to exercise official authority before inauguration.

The Pittsburgh Presbytery could not try Rev. Woodside because he was not a member.

Act 16th June, 1836, section 13, gives the courts of common pleas the jurisdiction and powers of a court of chancery over corporations: Sarer's Appeal, 32 P. F. Sm., 183.

When a division occurs in a congregation, the possession of church property must follow those who obey the laws of the church, and obey the injunction of the ecclesiastical court having jurisdiction: 3 Merivale, 400 ; 1 Dow. Pail. R., 1 ; 13 Wall., 679 ; 3 Barr, 282 ; 9 *Id.*, 321 ; 19 P. F. Sm., 469 ; 17 *Id.*, 138 ; 7 Wr., 244 ; 32 P. F. Sm., 183 ; 7 Hals., 206 ; 7 Monroe, 481 ; 13 W. N. C., 226

[Guthrie *v.* Hilty.]

The trial by the Northern Presbytery was not material to the issue, as the right of the Pittsburgh Presbytery was absolute.

November 10th, 1884.—Per Curiam: The right claimed by the appellant could only be acquired under the government and discipline of the Reformed Presbyterian church. By the rules of that church the right of installation is delegated to the Presbytery. Until it sees proper to install, a candidate for the pulpit has no right thereto as pastor. The Pittsburgh Presbytery, by due course of proceeding, refused to install the appellant, and ordered him to vacate the pulpit, which he had temporarily been suffered to occupy. He was further ordered to desist from preaching in the First Reformed Presbyterian church in Pittsburgh. Thenceforth his attempt to disregard the action of the Presbytery was in violation of the duly constituted authority of the church to which he owed obedience; and the learned judge committed no error in making the preliminary injunction perpetual.

Decree affirmed and appeal dismissed at the costs of the appellant.